**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **MARTY DUPREE,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:23-cv-00042-TES** |
| **ARCILLA MINING AND LAND COMPANY, LLC,** | |
| *Defendant.* | |

---

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

On January 31, 2023, Plaintiff Marty Dupree filed the present lawsuit against

his former employer, Defendant Arcilla Mining and Land Company, LLC, alleging

that Defendant tolerated racially motivated workplace harassment and treated him

differently than his black co-workers in violation of his rights under the Civil Rights

Act of 1991, 42 U.S.C. § 1981, during his four months of employment. *See* [Doc. 1, ¶¶

23, 28]. Following the discovery period, Defendant moved for summary judgment,

arguing that Plaintiff has failed to "demonstrate a genuine issue of material fact on

essential elements of his race discrimination and/or harassment claim." [Doc. 16-1, p.

7]. The Court agrees and **GRANTS** Defendant's Motion [Doc. 16].

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the

evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006).

## FACTUAL BACKGROUND

### 1.   The Incident

From February 14, 2022, to June 8, 2022, Defendant employed Plaintiff—a white man—as an Off-Road Dump Truck Driver at one of Defendant's mining sites in Attapulgus, Georgia, on a team with about eight other employees—all of whom were black. [Doc. 19, Dupree Depo., pp. 15:21-22, 17:2-8, 18:11-19:4, 31:2-22]; [Doc. 21, Faircloth Depo., pp. 20:4-21:18]; [Doc. 29-1, p. 2 ¶ 3].

To set the scene on the job site: Plaintiff's job involved physical labor, typically in an outdoor environment, where "there's a lot of shop talk," "tempers rise," and as shown below, plenty of salty language abounds. [Doc. 18, Harrison Depo., p. 36:9-11]; [Doc. 19, Dupree Depo., pp. 30:16-31:17]. Plaintiff loved his job with Defendant, and his supervisors considered him a good employee. [Doc. 19, Dupree Depo., p. 75:10-17]; [Doc. 20, Smith Depo., pp. 22:24-23:3, 38:19-39:8]. That said, his team lead, Jerome Jackson, testified that people talked about Plaintiff because of "the way he was acting,"

meaning "he was a little loud" in general and would "get really uptight and emotional about things."[1] [Doc. 26, Jackson Depo., pp. 37:11-38:5].

Viewing the evidence in the light most favorable to Plaintiff, at some point between February and June 2022, three of Plaintiff's black team members each made a comment that Plaintiff contends made him "fear[] for [his] life."[2] [Doc. 19, Dupree Depo., pp. 35:19-25, 75:11-20]. In addition to those three comments, at some point, someone threw Plaintiff's hardhat in the back of his dump truck. [Doc. 19, Dupree Depo., pp. 101:11-102:12]. Plaintiff reported this "hat trick" to Jackson, who also saw the hardhat in the back of the truck and who then reported it to *his* supervisor. [Doc. 26, Jackson Depo., pp. 36:23-37:10].

But let's get to the real meat of the harassment—those three allegedly threatening comments. First, once while on the job site, a co-worker named "Junior" (Jartaveus Richardson) drove his dump truck next to Plaintiff's, stopped about five to ten feet away, stuck half his body out the window, and told Plaintiff that he would "beat [his] goddamn ass." [Doc. 19, Dupree Depo., pp. 42:17-43:6; 46:14-16]. According to Plaintiff,

---

[1] Jackson was a team member who served as the "lead man" at that time. [Doc. 19, Dupree Depo., p. 116:12-13]; [Doc. 26, Jackson Depo., p. 8:17-24].

[2] The record doesn't clearly establish exactly when Plaintiff's co-workers made these statements. For example, at one point in his deposition, Plaintiff testified that the incidents began in April, but at other points, he stated that he could not recall in which month(s) either the first or second incidents occurred. *See* [Doc. 19, Dupree Depo., pp. 35:19-22, 45:12-21, 48:1-7]. Thus, they could have occurred any time between the commencement of Plaintiff's employment on February 14, 2022, and June 8, 2022, when he quit.

he knew of no reason that Junior would do this to him. [*Id*. at p. 43:5-6]. Plaintiff's team lead, Jackson, witnessed the event.[3] [*Id*. at p. 47:3-9]. Nothing in Plaintiff's testimony indicated that he thought Junior made the threatening comment because of his race at the time of the incident. *See* [*id*. at pp. 42:17-47:25 (Plaintiff recounting the first incident)].

Second, at a different point in time, while Plaintiff was again sitting in his truck, another co-worker named Nate got out of his truck and approached Plaintiff. [*Id*. at pp. 48:8-49:24]. When he was about 15 to 20 feet away, he yelled at Plaintiff, "[I]f you've got a problem with me, you get out of that truck[,] and I'll solve it." [*Id*.]. At first, Plaintiff ignored it, but nonetheless kept an eye on Nate, unsure what he was going to do. [*Id*.]. After a few minutes, Nate got in his truck and left. [*Id*.]. While there were no other witnesses to Nate's comment, Plaintiff reported it to the site supervisor, Arthur Faircloth, that morning, who told Plaintiff to not let it bother him and that he would handle it in the following day. [*Id*. at pp. 50:14-51:1]. Plaintiff also told Jackson, who told him to be careful. [*Id*. at p. 51:9-15].

Finally, on June 8, 2022,[4] Plaintiff was sitting in his truck, and a co-worker named Brandon Johns said over the radio, from about 100 yards away, that he would

---

[3] Jackson saw Junior sticking his body out the window and heard him yelling but wasn't sure what he said. [Doc. 19, Dupree Depo., pp. 43:7-11, 47:5-7].

[4] In Defendant's Statement of Material Facts, Defendant mistakenly refers to some of the events as taking place in 2023. *See, e.g.*, [Doc. 16-2, p. 6]. The events allegedly took place in 2022, and this lawsuit was filed in January 2023. *See* [Doc. 1, p. 7].

"beat [Plaintiff's] goddamn ass." [*Id.* at pp. 54:17-55:6, 58:6-8]. Jackson, who overheard the incident, testified that the two men were in their dump trucks, and he thinks Plaintiff "dumped it in the wrong place too many times." [Doc. 26, Jackson Depo., pp. 34:19-35:9]. Immediately after the incident, Jackson told Plaintiff he could report the behavior to the police.[5] *See* [Doc. 19, Dupree Depo., p. 56:8-11]. Plaintiff told Jackson that he was leaving and probably not coming back. [*Id.* at pp. 55:23-56:16]. Plaintiff candidly admitted that he understood he was voluntarily resigning at that moment. [*Id.* at p. 57:17-20].

At no point in any of these incidents did the co-workers mention anything about not liking Plaintiff because he was white. *See* [*id.* at p. 52:4-13]. Instead, Plaintiff's belief that the alleged harassment was race-based comes only from his own testimony that "one morning," Faircloth told him that his co-workers didn't like him because he was a

---

[5] In his Statement of Additional Material Facts, Plaintiff claims that Faircloth is the one who said this in his deposition, specifically at page 59, lines 3 through 7. [Doc. 24-1, p. 10 ¶ 54]. However, as Defendant points out in its Reply brief, there is no such page in Faircloth's deposition transcript, and the transcript is devoid of the word "police." *See* [Doc. 29, pp. 4–5 n.5]; *see generally* [Doc. 21, Faircloth Depo.]. It seems clear to the Court that this was simply a mistake, and Plaintiff meant to refer to Jerome Jackson, Plaintiff's team lead, not Faircloth, his supervisor. *See* [Doc. 18, Harrison Depo., p. 59:3-7 (Harrison confusing Jackson with Faircloth on page 59 of *her* deposition transcript)].

Further, Plaintiff testified that Jackson told him he should file a police report because the behavior was a "terroristic threat." [Doc. 19, Dupree Depo., pp. 96:24-97:15]; *see* [Doc. 1, ¶ 9]. Jackson testified to something somewhat similar, stating that he told Plaintiff that, "*if* you feel like you're being threatened, you can go to the Sheriff's department and do that." [Doc. 19, Dupree Depo., pp. 56:8-13, 96:24-97:15]; [Doc. 26, Jackson Depo., p. 35:3-9 (emphasis added)].

white man and that a day or two before that, Jackson told him "the same thing."[6] [*Id*. at pp. 53:5-22]. This bit of testimony is the only evidence indicating the harassment was motivated by race.[7]

**2.    The Investigation and Aftermath**

Plaintiff complained to Jackson and Faircloth about Nate's comment on or around the day it happened, and according to Faircloth, Plaintiff called him "on several occasions and reported that he was being harassed or threatened." [Doc. 19, Dupree Depo., pp. 50:14-23, 51:9-12]; [Doc. 21, Faircloth Depo., pp. 31:14-15, 32:18-25]. It is unclear when, but at some point, Faircloth began an informal investigation into the three comments, going to each of the three alleged perpetrators and asking them about Plaintiff's allegations—which they denied. [Doc. 21, Faircloth Depo., pp. 31:17-20]. Because they denied Plaintiff's allegations, Faircloth stated that there was "nothing really [he] could do if [he] do[es] not see it in person or hear it with [his] own ears because there's always two sides of the story." [*Id*. at pp. 31:21-32:1]. So ultimately, no further action was taken, and Faircloth simply told Plaintiff that everything would be

---

[6] Once again, nothing in the depositions (or the record as a whole for that matter) establishes when exactly Faircloth and Jackson allegedly told Plaintiff that the harassment was due to his race. *See* [Doc. 19, Dupree Depo., pp. 52:23-53:18].

[7] Neither Faircloth nor Jackson was asked about or testified as to whether they told Plaintiff the co-workers didn't like him because of his race. *See* [Doc. 29-1, pp. 6–7]. Consequently, in Defendant's Response to Plaintiff's Statement of Additional Material Facts, Defendant objects to Plaintiff's testimony as to Jackson and Faircloth's alleged statements on the grounds that it is inadmissible hearsay. [*Id*. (citing Fed. R. Evid. 801, 802)]. The Court will address this argument below.

great if he ignored the alleged comments and just did his job. [*Id*. at pp. 32:22-33:1].

After Plaintiff quit his job on June 8, 2022, the Human Resources Manager, Stephanie Harrison, was debriefed on the situation. *See* [*id*. at p. 33:13-19]; [Doc. 18, Harrison Depo., p. 24:3-14]. Harrison lives over three hours from the job site and had never met Plaintiff in person, so she conducted her investigation over the phone. [Doc. 37, Faircloth Depo., p. 37:19-22]; *see* [Doc. 18, Harrison Depo., pp. 24:2-8, 25:20-26:6].

First reaching out to Plaintiff, she found him "pretty distraught" and clearly "adamant" about not "want[ing] to continue to deal with his problem." [*Id*. at pp. 24:14-23, 73:23-74:1]. After that, to get the other side of the story, she spoke on the phone to the three alleged perpetrators. [*Id*. at pp. 24:20-25:3]. Just like with Faircloth, they denied threatening Plaintiff at all—but they did tell Harrison that they told Plaintiff "and the other guys" that "if you keep acting like that somebody's going to whoop your ass." [*Id*. at p. 27:3-19].

One of the co-workers, Brandon Johns, provided a written statement, but the others refused, thinking it "ludicrous" and "not want[ing] to write and have their name on a document."[8] [*Id*. at pp. 41:20-42:12]. Johns's written statement, dated June 9, 2022, indicates that he was displeased with how Plaintiff was doing his work. *See* [Doc. 24-5, p. 2]. He denies ever threatening Plaintiff but did admit that he told Plaintiff: "[O]ne

---

[8] Faircloth clarified in his deposition that he was the one who obtained a written account from Brandon Johns and just sent it to Harrison. [Doc. 21, Faircloth Depo., pp. 39:16-40:15].

day somebody is going to get on your ass." [*Id.*].

Defendant contends that, based on this information, the investigation was "inconclusive," and Harrison testified that "none of the information we received was in line with [Plaintiff's] statement." [Doc. 16-2, p. 8 ¶ 3]; [Doc. 18, Harrison Depo., p. 26:12-16]. In response to a question about whether Harrison thought there was any racism involved, Harrison said that Plaintiff's allegations were just "a threat of violence that he took personal, but it was not based on race." [Doc. 18, Harrison Depo., p. 68:2-6]. But Plaintiff contends that Harrison "discount[ed] the threat based on the perpetrator's version of the story," which Johns at least admitted partly happened. *See* [*id.* at p. 27:8-19]; [Doc. 24-1, p. 7 ¶ 31]. Plaintiff was never asked to give a written statement. [Doc. 19, Dupree Depo., pp. 113:15-23, 114:8-22]. Jerome Jackson stated in his deposition that he never participated in any investigation regarding Plaintiff's complaints until Plaintiff filed suit, nor did anyone ask him to give a written statement. [Doc. 26, Jackson Depo., p. 29:13-25].

Around a day after Plaintiff resigned, a site supervisor named Jacob Smith called Plaintiff and offered to move him to a different location. [Doc. 20, Smith Depo., p. 38:19-22]. Plaintiff, however, was wary because even if he was at a different location, if there was ever a rainy day, he would have to be in the shop with the same people who he claimed had harassed him. [Doc. 19, Dupree Depo., pp. 76:13-77:10]. "[F]earful for [his] life," he declined. [*Id.* at p. 75:11-20]. Smith told Plaintiff that if he ever decided he

wanted to come back, all he had to do was call Smith. [*Id*. at p. 75:21-24]. Aside from the

phone call and Faircloth's informal investigation, Plaintiff contends that Defendant took

no other action in response to Plaintiff's reports. [*Id*. at p. 77:11-14].

### 3.    Defendant's No-Harassment Policy

Defendant's No-Harassment Policy states that Defendant "do[es] not tolerate the

harassment of . . . employees . . . relating to an individual's race" and that violations of

the policy "will result in disciplinary action, up to and including immediate

termination." [Doc. 24-4, p. 2]. To report an alleged violation of the no-racial-

harassment policy, an employee should:

> 1. First, discuss any concern with your Supervisor.
> 2. If you are not satisfied after you speak with your Supervisor, or if you feel that you cannot speak to your Supervisor, discuss your concern with the Vice-President.
> 3. If you are not satisfied after you speak with the Vice-President, or if you feel you cannot speak to the Vice-President, speak to the President.

[Doc. 24-4, p. 3].

### DISCUSSION

Broadly, § 1981 prohibits employers from intentionally discriminating in

employment contracts on the basis of race. *See Johnson v. Ry. Express Agency, Inc.*, 421

U.S. 454, 459–60 (1975); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). At

summary judgment, Defendant parses the facts alleged in Plaintiff's Complaint out

into two potential types of § 1981 claims: (1) hostile work environment and (2)

disparate treatment. *See* [Doc. 16-1, pp. 7, 9]. Plaintiff's Complaint is pretty

bareboned, alleging these two potential claims in somewhat vague terms. For example, Defendant seems to have gleaned (1) his workplace harassment claim from Plaintiff's allegations that he "has been embarrassed" and "humiliated" and that "Defendant chose not to take appropriate remedial steps to prevent or correct the harassment" and (2) his disparate treatment claim from Plaintiff's allegation that he was subjected to "different terms and conditions of employment." *See* [Doc. 1, ¶¶ 18, 23, 26, 28]. Because Plaintiff responded to the Defendant's Motion for Summary Judgment by arguing that Plaintiff was indeed subjected to (1) a hostile work environment and (2) disparate treatment in his Response, the Court reviews the evidence to determine if it supports these two claims, addressing each in turn. *See* [Doc. 24, pp. 8, 16].

    **1.**    <u>**Hostile Work Environment**</u>

Defendant moves for summary judgment on the grounds that Plaintiff has not created a triable issue of fact as to his hostile work environment claim. [Doc. 16-1, p. 11]. The Court agrees and **GRANTS** Defendant's Motion for Summary Judgment [Doc. 16] on this claim.

A hostile work environment claim is a different kind of discrimination claim than a run-of-the mill refusal to hire, failure to promote, or wrongful termination claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Rather than a one-time discrete act, a hostile work environment claim involves "a series of separate acts

that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)); *see McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008). Its "very nature involves repeated conduct" and thus is "based on the cumulative effect of individual acts," such as "discriminatory intimidation, ridicule, and insult." *Nat'l R.R.*, 536 U.S. at 114–16 (internal citations omitted).

"A hostile work environment claim . . . is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).[9] The Eleventh Circuit has consistently held that to establish a discrimination claim based on a hostile work environment, a plaintiff must show: "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under

---

[9] Some of the cases cited involve claims brought under Title VII rather than § 1981. Title VII and § 1981 cases share the same liability standards. *See Stallworth v. Shuler*, 777 F.2d 1431 (11th Cir. 1985); *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008); *Rodemaker v. Shumphard*, 859 F. App'x 450 (11th Cir. 2021) ("In an employment-discrimination context, the elements for §§ 1981 and 1983 are identical to those required to prove intentional discrimination under Title VII."). As discussed in the next footnote, the only difference is that they have different standards of causation.

either a theory of vicarious or of direct liability." *Id.*

Defendant does not dispute the first and second elements—that Plaintiff belongs to a protected group and has been subject to unwelcome harassment. Instead, Defendant argues that Plaintiff cannot establish the third, fourth, or fifth elements, entitling it to judgment as a matter of law. [Doc. 16-1, pp. 9, 16]; *see* [Doc. 24, p. 8]. The Court agrees.

A.    Based on a Protected Characteristic

The third element requires that Plaintiff "show that but for the fact of [his race], [he] would not have been the object of harassment." *See Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). "This does not require [Plaintiff] to prove that race was the exclusive cause of the [harassment], but it does require him to prove that but for his race," the harassment would not have occurred. *See Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1014 (11th Cir. 2023). "So to survive summary judgment, [Plaintiff] needs to show that a reasonable jury could conclude that had he not been white, he would not have been [harassed]." *Id.*; *see also Bryant v. Norfolk S. R.R.*, No. 5:20-CV-00225-TES, 2022 WL 264874 (M.D. Ga. Jan. 27, 2022), *aff'd*, No. 22-10452, 2022 WL 17420593 (11th Cir. Dec. 6, 2022) (finding that there was no evidence to suggest harassment was based on the plaintiff's sex for purposes of Title VII when a male defendant told a male plaintiff that he was going to rape him, in the context of a "spat" between the two employees). In other words, at trial, Plaintiff would need to

establish that the harassment was *discriminatory* harassment. *See Miller, Inc.*, 277 F.3d at 1275 (explaining that a hostile work environment claim is one in which there is recurring "*discriminatory* intimidation, ridicule, and insult") (emphasis added). If he was harassed simply because he was a lazy, unproductive, inefficient, rude or disagreeable worker, for example, then that simply isn't enough to hold the employer liable under §1981, which deals only with race-based discrimination. *See Bond v. Georgia Power Co.*, No. 5:17-CV-00014-TES, 2018 WL 2422319, at *7 (M.D. Ga. May 29, 2018) (holding that a white employee yelling at a black employee because of his actions on the job could not constitute harassment on the basis of race). In fact, it has to be more than simply tied to his race or motivated by his race—but *because of* his race.[10] *Rodemaker v. Shumphard*, 859 F. App'x 450, 452 (11th Cir. 2021).

Plaintiff admitted in his deposition that none of his co-workers told Plaintiff their comments were because of, or but for, his race. [Doc. 19, Dupree Depo., pp. 47:16-18, 51:22-24, 59:14-20]. So, his belief that race motivated his co-workers when they made those three comments must be based on something or someone else. Defendant argues that Plaintiff has identified no admissible evidence to suggest the comments were connected to Plaintiff's race, and his assertion that his co-workers'

---

[10] This is where § 1981 claims and Title VII claims part ways. For a § 1981 claim, the successful plaintiff must prove race was a but-for cause of the adverse employment action, whereas for a Title VII claim, the question is only whether race was a "motivating factor." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014, 1017 (2020); *see also Rodemaker*, 859 F. App'x at 452 ("One key difference, significant here, is that a § 1981 plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right.").

comments were racially motivated are based on "nothing other than his own subjective belief." [Doc. 16-1, p. 11]; [Doc. 29, p. 2]. To that end, Defendant is correct that to the extent that Plaintiff simply speculates that the three co-workers' alleged comments were because of his race, this is pure conjecture, and the Court cannot consider it evidence for purposes of ruling on a motion for summary judgment. *See, e.g.*, [Doc. 19, Dupree Depo., p. 59:5-13 (stating that "[he] just feel[s] in [his] mind that that's what . . . it all amounted to because of the other two" in response to a question about why he thought Brandon Johns's comment was because of his race); *Plaisance v. Travelers Ins. Co.*, 880 F. Supp. 798, 804 (N.D. Ga. 1994), *aff'd*, 56 F.3d 1391 (11th Cir. 1995) ("[C]onclusory allegations based on mere subjective beliefs do not create a genuine issue of material fact.").

To be certain, though, Plaintiff also alleges another basis for his belief: Plaintiff testified that both Jackson and Faircloth told him that his black co-workers didn't like him because he was white. [Doc. 19, Dupree Depo., pp. 52:20-53:18, 59:5-20]. Defendant argues that this is inadmissible hearsay, but the Court disagrees. *See* [Doc. 16-1, p. 11]; [Doc. 29-1, pp. 6–7]. Jackson and Faircloth made the alleged statements as Defendant's employees on a matter within the scope of their jobs as team lead and supervisor. That brings them nicely within the definition of "non-hearsay" found in Federal Rule of Evidence 801(d)(2)(D). Nevertheless, although the Court considers Plaintiff's testimony about Jackson's and Faircloth's statements, there is nothing to

suggest that Jackson and Faircloth based *their* beliefs on anything more than pure

conjecture, and the Court considers them insufficient to establish but-for causation as

a matter of law.

Race-neutral comments—no matter how off-color—are not what the drafters of

§ 1981 had in mind when they set out to prevent against racial discrimination. *See*

*Johnson*, 421 U.S. at 459 ("[Section 1981] on its face relates primarily to racial

discrimination in the making and enforcement of contracts."). This Court has made

this point before. In *Bond v. Georgia Power Company*, this Court held that a white

employee saying to a black employee, "[I]f [I] had a gun [I] would have shot [you],"

was not sufficient to establish racial harassment where the comment was in response

to the black plaintiff putting the white employee's safety at risk on the job. *See* 2018

WL 2422319, at *7. This holding was made despite the plaintiff having experienced

explicitly racial comments from other white employees about why he was hired and

couldn't be fired. *Id*. In contrast, here, not a one of the comments from any of

Plaintiff's co-workers are racially tinged. Sure, Plaintiff believes his co-workers didn't

like him because he was white—but he only believes that because (1) "[he] just feel[s]

in [his] mind" and (2) he took his supervisors' speculative word for it. *See* [Doc. 19,

Dupree Depo, pp. 52:20-53:18, 59:5-20]. That's it. Plaintiff never asked his supervisors

why they believed that before he quit, nor did he ask them when he deposed them.

*See* [*id*.]; *see generally* [Doc. 21, Faircloth Depo.]; [Doc. 26, Jackson Depo.]. Basically,

Plaintiff just assumes that because three of his black co-workers threatened him in some manner, they must have done so only because he is white. *See* [Doc. 19, Dupree Depo., pp. 51:22-52:8 (When asked repeatedly *why* he believed Nate's comment was because of his race, Plaintiff answered, "They didn't want a white man working there," and "Because they wanted it all to themselves.")].

At the end of the day, the Court is unwilling to say that every instance of workplace strife between people of different races or ethnicities is *because of* race or is automatically stained with racial animosity.[11] Any number of non-racial factors could abound when two employees clash: a difference in personality or a simple work quarrel, for starters.

And indeed, a number of other such factors do abound here. For one, Jackson testified that people talked about Plaintiff because of "the way he was acting," meaning "he was a little loud" in general and would "get really uptight and emotional about things." [Doc. 26, Jackson Depo., pp. 37:11-38:5]. Supervisor Jacob Smith—who, by the way, is white—stated that although Plaintiff "was always a super nice guy" to and in front of Smith, he had heard from Faircloth—also white—that Plaintiff could be a little bit "mouthy" and have "a bit of a temper." [Doc. 20, Smith

---

[11] That is not to say that racial harassment must *always* involve an explicit mention of race—but if all we have are race-neutral comments, there must be some other accompanying factors to indicate the harassment was truly based on race. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1301 (11th Cir. 2012) (holding that a reasonable jury could find that a yardman—whom the plaintiff had seen wearing Confederate apparel—approaching the plaintiff with a crowbar and looking at him "in a certain way" was race-based, even though the encounter "did not include any overt reference to [the plaintiff's] race").

Depo., pp. 22:18-24:11]; *see* [Doc. 19, Dupree Depo., p. 28:4-6]. Johns's written

statement, written one day after his altercation with Plaintiff, seems to indicate that

he was displeased with how Plaintiff was doing his work, complaining that Plaintiff

"would come on the dump and just dump wherever he wanted to." [Doc. 24-5, p. 2].

And finally, on that same note, Jackson testified that the incident with Johns began

when Plaintiff "dumped . . . in the wrong place too many times." [Doc. 26, Jackson

Depo., p. 35:4-9].

     The only basis whatsoever that this case involves *racial* harassment hinges

upon one tiny piece—a scintilla—of evidence: Plaintiff's unexplained testimony that

Jackson and Faircloth told him his black co-workers didn't like him because he was

white. *See* [Doc. 19, Dupree Depo., pp. 52:20-53:18, 59:5-20]; *Brooks*, 446 F.3d at 1162.

He filed no affidavit expounding upon this, nor did he ask Jackson or Faircloth about

it in their depositions. *See generally* [Doc. 21, Faircloth Depo.]; [Doc. 26, Jackson

Depo.]. As a result, there is nothing to suggest that their alleged statements were

anything more than raw speculation. *See Unum Life Insrance Co. of Am. v. Morrison

Phillips*, No. 3:21-CV-71-CAR, 2023 WL 2695098, at *4 (M.D. Ga. Mar. 29, 2023)

("Speculation does not create a genuine issue of fact, and there must be more than a

'mere scintilla of evidence' to survive summary judgment."). Instead, the Court is left

with nothing except this "mere scintilla" of evidence—this one-sentence statement

buried in the Plaintiff's deposition—that barely rises above the level of bare

allegation. *See Brooks*, 446 F.3d at 1162. And yet, without it, there is no argument *whatsoever* that this is a *race* harassment case—let alone one that should proceed to trial.

There is simply nothing beyond a speculative scintilla of evidence for a jury to find that the co-workers were motivated by race—let alone enough to meet § 1981's elevated burden of but-for causation. However, *even if* the Court were persuaded that there is enough evidence for a jury to find race was the but-for cause of the harassment, Defendant would still prevail because there is still insufficient evidence for a reasonable jury to find that the harassment was severe or pervasive or that Defendant failed to take sufficient remedial measures.

B.    Sufficiently Severe or Pervasive

This element involves both a subjective and objective piece:

> "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond [§ 1981's] purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [§ 1981] violation."

*Harris*, 510 U.S. at 21–22; *see Miller*, 277 F.3d at 1276 ("This requirement, as defined by the Supreme Court, contains both an objective and a subjective component."). In other words, not only must the victim "subjectively perceive" the environment "to be abusive," but it must also be the case that "a reasonable person would find [it] hostile and abusive." *Miller*, 277 F.3d at 1276. While Plaintiff certainly perceived the

harassment as severe, Defendant argues that Plaintiff has failed to present evidence that the harassment was *objectively* severe or pervasive. [Doc. 16-1, pp. 12–14].

In determining whether the objective component is present, the Eleventh Circuit considers the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the employee's job performance—among any other relevant factors.[12] *Miller*, 277 F.3d at 1276; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). The Supreme Court has emphasized "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

i.      *Frequency*

First, Defendant argues that the alleged comments were isolated and infrequent. [Doc. 16-1, p. 12]. While there is no magic number of incidents of harassment that Plaintiff must endure before his hostile work environment claim becomes actionable, there is a blurry line somewhere, and isolated incidents of name-calling do not suffice. *See Perry v. Rogers*, 627 F. App'x 823, 841 (11th Cir. 2015)

---

[12] Courts often discuss these factors all at once. *See, e.g.*, *Washington v. Util. Trailer Mfg. Co.*, No. 1:13-CV-610-WKW, 2017 WL 924469, at *15–16 (M.D. Ala. Mar. 8, 2017); Jones, 683 F.3d at 1303. Because they are so intertwined, the Court will discuss the severity and physically threatening or humiliating elements in tandem.

(explaining that "no magic number exists to enable a plaintiff to establish the harassment necessary to make out a hostile-work-environment claim"). To illustrate, the Court provides a few examples.

In *Adams v. Austal*, the Eleventh Circuit held that some of the plaintiffs' exposure to racial slurs and Confederate flags "every morning," "regularly," or "all the time" was "frequent" enough for purposes of finding a hostile work environment. 754 F.3d 1240, 1251–54 (11th Cir. 2014). On the other hand, the Court also held that one of the losing plaintiffs, who heard the "N" word a few times over the course of several years and never from a supervisor, did not experience frequent enough harassment to support a claim, even though the slur itself was severe. *Id*. at 1254–55. Another losing plaintiff experiencing a few isolated incidents second-hand—such as once hearing someone call her co-worker "Darth Vader," someone using the "N" word once maybe jokingly, and other employees telling her about a co-worker wearing apparel with a Confederate flag on it—were not frequent enough to warrant a claim. *Id*. at 1256.

The Eleventh Circuit also affirmed a district court's ruling that twelve *racially charged* comments over the course of seven months was insufficiently frequent to survive summary judgment. *See Fortson v. Columbia Farms Feed Mill*, 34 F. Supp. 3d 1302, 1306 (M.D. Ga. 2014), *aff'd sub nom. Fortson v. Carlson*, 618 F. App'x 601 (11th Cir. 2015) (distinguishing *Adams*, 754 F.3d at 1251–54). Here, if we take the three

comments and the hardhat incident into account, there were only four incidents over the four months that Plaintiff worked for Defendant. *See* [Doc. 19, Dupree Depo., ¶¶ 1, 23], *in connection with* [Doc. 16-2, ¶ 23]. In other words, the conduct in *Fortson* occurred almost twice as frequently than the alleged conduct here.[13] *See* 34 F. Supp. 3d at 1306–07. That said, it should be noted that the comments in *Fortson* were not physically threatening but instead racial slurs—which brings us to the next factor. *See id*. On this record, the Court finds the "frequency" factor to weigh in Defendant's favor.

ii.    *Severity and Physically Threatening Nature of the Comments*

"Either severity *or* pervasiveness is sufficient to establish [a hostile work environment]." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). So, infrequent as the harassment may be, Plaintiff could still survive summary judgment if there were sufficient evidence that the harassment was "severe." *Washington v. Util. Trailer Mfg. Co.*, No. 1:13-CV-610-WKW, 2017 WL 924469, at * 4 n.8 (M.D. Ala. Mar. 8, 2017) ("Harassment that reasonably can be construed as a physical threat, even when infrequent, carries much weight in the hostile work environment context."). Plaintiff also fails here.

In *Jones v. UPS Ground Freight*, the Eleventh Circuit reversed a district court's decision granting summary judgment where the plaintiff, after reporting a few

---

[13] Even assuming the comments began in April, the conduct in *Fortson* still occurred more frequently.

racially suggestive comments and that someone put bananas on his truck, was met

after work by two Confederate-flag-wearing co-workers who confronted him for

talking with management about the harassment. 683 F.3d 1283, 1290 (11th Cir. 2012).

It was dark; the plaintiff was outnumbered; and one of the co-workers brought a

crowbar, presumably to send an implicit threat. *Id*. Combined with the Circuit's

holding in *Adams*, *Jones* stands for the proposition that direct physical threats weigh

heavily in favor of finding a hostile work environment. *Washington*, 2017 WL 924469,

at *4 n.8; *see also Adams*, 754 F.3d at 1254 (finding that employees who only heard

about a drawing of a noose second-hand were not directly threatened or humiliated).

But it is also necessary to consider "the social context in which particular

behavior occurs and is experienced" when evaluating whether a work environment is

hostile. *Oncale*, 523 U.S. at 81. Additionally, § 1981 is not a "general civility code."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). However severe or pervasive,

the statute does not prohibit any harassment, but only harassment that is *based on a*

*protected characteristic* like race. *See Reeves*, 594 F.3d at 809 (explaining that Title VII

only applies to harassment based on a protected characteristic like sex); *Baldwin v.*

*Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301–02 (11th Cir. 2007) (same). A §

1981 workplace harassment claim is meant to protect against *discriminatory*

harassment, not all harassment, no matter how pervasive or severe.

At first blush, the alleged threats in this case seem physically threatening. The

comments, according to Plaintiff, involve warnings about Plaintiff being beaten.[14]

Plaintiff was 58 years old and was the only white man present. [Doc. 29-1, p. 2, ¶ 3];

[Doc. 19, Dupree Depo, p. 101:7-9]. And finally, Plaintiff testified that two of the co-

workers outweighed him by 70 pounds. [Doc. 19, Dupree Depo, pp. 99:20-100:9]. But

this Court and other courts in our Circuit have found much more "boorish and

offensive comments" not to be severe and pervasive enough to constitute an

actionable hostile work environment claim. *See, e.g., Norfolk S. R.R.*, 2022 WL 264874,

at *9. While Plaintiff certainly perceived the comments to be hostile and abusive,

there's more to it. The question remains whether they were *objectively* severe. *See*

*Miller*, 277 F.3d at 1276. Assuming the co-workers did make the comments exactly as

Plaintiff contends, the Court does not find them sufficiently objectively threatening or

humiliating for purposes of § 1981.

But, the Court must consider the social context of the comments. *See Fortson*,

618 F. App'x at 607–08. Plaintiff and his team members not only drove trucks; their

role involved physical labor. [Doc. 19, Dupree Depo, pp. 30:16-25, 31:10-17]. At the

mining site, "there's a lot of shop talk" and "tempers rise." [Doc. 18, Harrison Depo.,

p. 36:9-11]. Plaintiff admitted that on the site, co-workers often got agitated with each

---

[14] As a refresher, Junior's and Johns's alleged comments were that they would "beat [Plaintiff's] goddamn ass." [Doc. 19, Dupree Depo., pp. 42:17-43:6; 46:16, 54:17-55:6]. And Nate's comment was allegedly: "[I]f you've got a problem with me, you get out of that truck and I'll solve it." [*Id*. at pp. 48:8-49:24].

other.[15] *See* [Doc. 19, Dupree Depo., pp. 32:17-33:12]. In this sort of physically intense, outside work environment, one should not and would not expect the language or conduct to remain "Sunday School" proper at all times. Without a doubt, the record shows that coarse language abounded, and the Court holds no illusion that it wasn't also accompanied by plenty of attendant coarse social behavior.

Next, let's look to the specific context of the three comments. Defendant argues that while the alleged comments may be considered physically threatening if considered in a vacuum, as it actually happened, they were accompanied by no other factors such that Plaintiff should have perceived himself to be in actual physical danger. [Doc. 16-1, p. 14]. The Court agrees. When his three co-workers made these allegedly threatening statements, they weren't "chest bumping" or even face-to-face. While Junior was five to ten feet from Plaintiff, he was also in an adjacent truck. [Doc. 19, Dupree, Depo., pp. 42:17-43:6; 46:16]. Nate—while he did get out of his truck and start to approach Plaintiff—stopped 15 to 20 feet away. [*Id*. at pp. 48:8-49:24]. And, Johns's comment came over the radio from another vehicle. [*Id*. at pp. 54:17-55:6]. Finally, whoever threw Plaintiff's hat in the back of his truck did it while Plaintiff wasn't present. *See* [*id*. at pp. 101:11-102:12].

---

[15] In response to the question, "[D]id your co-workers often get upset or agitated with each other?" Plaintiff responded, "[T]here was some agitation going on, yes" but stated that he didn't pay attention to it if it didn't involve him. [Doc. 19, Dupree Depo., pp. 32:17-33:12]. Plaintiff further stated, however, that he did not overhear any specific disagreements between co-workers. [*Id*. at p. 33:13-16].

In *Norfolk Southern*, this Court found that the male defendant's threat to rape the male plaintiff was not physically threatening when considered in the context of the two men having a spat and then returning to casual conversation immediately after the alleged threat. *See* 2022 WL 264874, at *10. Granted, the plaintiff in *Norfolk Southern* was not really afraid that the defendant would rape him, whereas our Plaintiff contends that he really did fear for his life. *Id*. at *3; [Doc. 19, Dupree Depo., p. 75:11-20]. But that distinction only speaks to the subjective component of whether something is severe or pervasive, not whether it was objectively severe.

Finally, none of the comments even included racial slurs, epithets, actions, or gestures, nor did the co-workers say anything about Plaintiff's race. [Doc. 19, Dupree Depo., pp. 47:16-18, 51:22-24, 52:4-13, 59:14-20]. In *Adams*, the Eleventh Circuit granted summary judgment for the defendant as to a plaintiff whose tools were vandalized and who failed to point to evidence that the vandalism was tied to her race. 754 F.3d at 1255–56. As in the case at bar, no co-worker ever made a racist comment directly to the plaintiff there. *See id*. Here, Plaintiff testified that his supervisors told him his co-workers didn't like him due to his race, but again, Plaintiff admits that none of the three alleged comments ever mentioned race. [Doc. 19, Dupree Depo., pp. 37:16-24, 47:10-22, 52:20-53:18, 59:5-20]. Similarly, one of the losing plaintiffs in *Adams* had heard through the grapevine that others had experienced racial comments and insults. 754 F.3d at 1255–56. When considered in

their full context, the Court finds the three comments and the hardhat incident here

are not sufficiently objectively severe or physically threatening. These factors also

weigh in favor of Defendant.

iii.    *Effect on Plaintiff's Job Performance*

Lastly, Defendant rests its case as to the severe-and-pervasive element on the

assertion that the alleged comments did not disrupt Plaintiff's job performance and

therefore is not "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Miller*, 277 F.3d at 1275.

On the one hand, Plaintiff testified that prior to quitting, he loved his job with

Defendant, and his supervisors considered him a good employee. [Doc. 19, Dupree

Depo., p. 75:10-17]; [Doc. 20, Smith Depo., pp. 22:24-23:3, 38:19-39:8]; *see McCann*, 526

F.3d at 1379 (holding that the plaintiff could not establish that racial comments

affected her work performance, even though they upset her, because she testified that

it did not affect her work). And, of course, he kept right on working with no apparent

issues until Johns' over-the-radio comments.

Nevertheless, there is certainly evidence that the alleged harassment caused

Plaintiff distress and ultimately made him feel like he needed to leave his job. *See*

[Doc. 18, Harrison Depo., pp. 73:23-74:1 (Harrison describing Plaintiff as "distraught"

when reporting the alleged harassment to her)]; [Doc. 19, Dupree Depo., p. 75:11-20

(Plaintiff testifying that he told his supervisor he couldn't return to work because he

27

felt "fearful for [his] life")]. All in all, even if the Court determined that the incidents

had *an* effect on Plaintiff's job performance, this factor alone is not dispositive; the

question is one of the totality of the circumstances. *See Miller*, 277 F.3d at 1277. And

based on the totality of the evidence here—race-neutral, infrequent comments—no

reasonable jury could conclude that Plaintiff meets the "severe or pervasive" element.

### C.    Employer Responsibility

Lastly, Defendant argues that even if Plaintiff could show each of the above

elements, he cannot hold Defendant liable because Defendant took prompt and

adequate remedial action upon hearing of Plaintiff's complaints about his co-workers'

alleged conduct. [Doc. 16-1, p. 15]. Only when an employer (1) knew or should have

known of the harassment and (2) failed to take prompt and appropriate remedial action

can the employer be held responsible. *Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1287

(11th Cir. 2018); *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000).

Defendant does not dispute that it knew of the harassment but does argue that in

conducting an (ultimately inconclusive) internal investigation regarding Plaintiff's

accusations, it took "prompt and appropriate remedial action." [Doc. 16-1, pp. 15–16];

*Wilcox*, 892 F.3d at 1287.

Plaintiff contends that Defendant took no actual action beyond Faircloth and

Harrison talking to the alleged perpetrators, and Harrison doing so over the phone. *See*

[Doc. 21, Faircloth Depo., pp. 31:17-20, 37:19-22]; [Doc. 18, Harrison Depo., pp. 24:2-8,

25:20-26:6]. And Plaintiff contends that Harrison "discount[ed] the threat based on the perpetrator's version of the story," which he at least admitted partly happened. *See* [*id.*]; [Doc. 24-1, p. 7 ¶ 31]. Specifically, Plaintiff argues that the one perpetrator who provided a written statement admitted to at least something along the lines of what Defendant alleged he said—admitting to telling Plaintiff that "somebody's going to whoop your ass." *See* [Doc. 18, Harrison Depo., p. 27:8-19].

An informal inquiry may suffice as a reasonable remedial action, but to be sufficient, it must be conducted "in an effort to arrive at a reasonably fair estimate of truth." *Baldwin*, 480 F.3d at 1304. Defendant here did just that. Both Faircloth and Harrison conducted investigations, with Faircloth asking the alleged perpetrators their side of the story and ultimately reporting it to the Human Resources Director. *See* [Doc. 21, Faircloth Depo., pp. 31:17-20, 37:19-22]; [Doc. 18, Harrison Depo., pp. 24:2-8, 25:20-26:6]. And although Johns admitted to saying, "somebody's going to whoop your ass," his written statement indicates that he made the statement because of something Plaintiff was doing while carrying out his job, not because Plaintiff is white. [Doc. 24-5, p. 2 (indicating that Johns was displeased with how Plaintiff was doing his work)]. Because there was no other evidence and the situation was just a "he said/she said," Faircloth felt there was nothing more to be done. *See* [Doc. 21, Faircloth Depo., pp. 31:21-32:1]. Finally, at some point shortly after Plaintiff resigned, Smith called Plaintiff and offered to move him to a different location and that if ever he decided he wanted to

come back, all he needed to do was call Smith. [Doc. 20, Smith Depo., p. 38:19-22]; [Doc. 19, Dupree Depo., p. 75:21-24]. Plaintiff testified that he declined the opportunity because if there was a rainy day, all employees would go to the shop and would have to be around the same people who harassed him. [Doc. 19, Dupree Depo., pp. 76:13-77:10].

But, an employer is only required to take remedial action to prevent *unlawful* harassment, i.e., harassment that occurred because of an employee's protected characteristic such as race, age or sex – not any other sort of unpleasant remark or interaction that occurs in the workplace that the aggrieved employee considers "harassing" conduct. On this record, Plaintiff never reported that his coworkers threatened him because of his race; yet, Defendant nonetheless investigated his complaints, ultimately concluding they weren't race-related. And that is what they were required to do. Additionally, Plaintiff did not give Defendant time to remedy the situation or make him the offer to move to another site before he quit. He clearly testified that he voluntarily resigned after the third comment and that was before Harrison began her HR investigation. *See* [*id*.].

Accordingly, the Court finds no genuine dispute of material fact as to at least one, if not three, essential elements of a hostile work environment claim, and that lack of evidence entitles Defendant to judgment on this claim as a matter of law.

### 2.    Disparate Treatment

The central premise of a disparate treatment claim is that "similarly situated

workers are treated differently even though they have committed similar acts."

*Osram Sylvania, Inc. v. Teamsters Local Union*, 87 F.3d 1261, 1265 (11th Cir. 1996). In

their Motion for Summary Judgment, Defendant points to several cases from within

the Eleventh Circuit that rely on the Supreme Court's burden-shifting framework

from *McDonnell Douglas Corp. v. Green*, arguing that Plaintiff has failed to establish a

prima facie case of discrimination and therefore, Defendant is entitled to summary

judgment. *See, e.g., Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006)

(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *Holifield v. Reno*,

115 F.3d 1555, 1561–62 (11th Cir. 1997), *abrogated by Lewis v. Union City, Ga.*, 918 F.3d

1213 (11th Cir. 2019) (en banc) (same). Under *McDonnell Douglas*, one way that a

plaintiff can establish a prima facie case of discrimination is by showing, among other

elements, that he (1) is a member of a protected class, (2) was qualified for his

position, (3) suffered an adverse employment action, and (4) was treated less

favorably than a similarly situated employee outside of his class (that is, a

"comparator"). 411 U.S. at 802. Defendant argues that Plaintiff fails to meet the third

and fourth elements.

The problem, however, as Plaintiff points out in his Response brief, is that

*McDonnell Douglas* is an evidentiary framework, "not a set of elements that the

employee must prove—either to survive summary judgment or prevail at trial."[16]

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023) (rejecting the

defendant's argument that it was entitled to summary judgment because the plaintiff

did not present sufficient comparators); [Doc. 24, pp. 17–18]. "[E]stablishing the

elements of the *McDonnell Douglas* framework is not, and never was intended to be,

the *sine qua non* for a plaintiff to survive a summary judgment motion in an

employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328

(11th Cir. 2011). Rather, a plaintiff will survive summary judgment if he can present a

"convincing mosaic of circumstantial evidence that would allow a jury to infer

intentional discrimination by the decisionmaker." *Id*. at 1327–28 (internal citations

omitted).

Therefore, even if Plaintiff failed to establish, for example, a sufficient

comparator, that doesn't necessarily "doom [his] case," even if it would be a

probative factor. *Id*.; *see also Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (listing

probative factors). That said, it *would* doom his case, however, if he failed to establish

that he was a member of a protected class or that he suffered an adverse employment

---

[16] In all fairness to Defendant, "parties (and sometimes courts) miss this fundamental point and wrongly treat the prima facie case as a substantive standard of liability." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 945 (11th Cir. 2023). Although the phrase "prima facie case" ordinarily describes a plaintiff's burden of producing evidence to permit a trier of fact to infer a fact at issue, the phrase has a special meaning within the context of *McDonnell Douglas*. *Id*. In that context, it—quite paradoxically— means to establish a rebuttable presumption of discrimination. *Id*. Also in fairness to Defendant, Defendant corrects this misunderstanding in its Reply brief, in which it argues Plaintiff has not produced evidence that could establish a "convincing mosaic" of discrimination." [Doc. 29, pp. 7–8].

action. *See Tynes*, 88 F.4th at 946. Those are essential substantive elements. Other "[e]vidence that is likely to be probative is 'evidence that demonstrates, among other things, . . . suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, . . . [or] pretext.'" *Id*. at *13 n.2 (quoting *Jenkins*, 26 F.4th at 1250).

Defendant does not dispute that Plaintiff is a member of a protected class but does argue that there is no evidence of an adverse employment action. From Plaintiff's Complaint, it is difficult to tell what the factual basis is for his disparate treatment claim is at all—merely alleging the harassing comments and that he was treated "different[ly]" and was "forced to resign." [Doc. 1, ¶¶ 12, 15, 23]. In its Motion for Summary Judgment, Defendant seems to have gleaned that at least one of the factual bases for the adverse employment action is constructive discharge based on Plaintiff's claim that he was "forced to resign." [*Id*. at ¶ 15]; [Doc. 16, p. 8]. In his Response brief, Plaintiff hones this claim, arguing disparate treatment vis-à-vis constructive discharge. [Doc. 29, p. 9].

Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim. *Bryant v. Jones*, 575 F.3d 1281 (11th Cir. 2009) (citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992), *aff'd*, 511 U.S. 244 (1994); *see also Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316–18 (11th Cir. 1989) (affirming a district court's finding that plaintiffs established that they were

subjected to a hostile work environment but were not constructively discharged);

*Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905–06 (11th Cir. 1988) (same).

Where a plaintiff fails to establish the existence of a hostile work environment, he

cannot establish constructive discharge as a matter of law. *Davis v. Dunn Const. Co.*,

872 F.Supp.2d 1291, 1312–14 (N.D. Ala. 2012); *see Pa. State Police v. Suders*, 542 U.S.

129, 149 (2004). In other words, a hostile work environment claim can exist where

constructive discharge does not, but constructive discharge—and therefore, a

disparate treatment claim based on constructive discharge as the adverse

employment action—can only exist where the Court has already found a hostile work

environment. Because the Court dismissed Plaintiff's hostile work environment

claim, the Court cannot find disparate treatment based on constructive discharge as a

matter of law.

That leaves only whatever disparate treatment Plaintiff is alleging aside from

the failed constructive discharge. It is unclear to the Court what other adverse

employment action could serve as the basis for Plaintiff's disparate treatment claim

other than the alleged constructive discharge. In his Response to the Defendant's

Motion for Summary Judgment, Plaintiff seems to clarify that he is also asserting

disparate treatment based on Defendant allegedly "refus[ing] to enforce its

disciplinary procedures against his harassers to stop their threats of violence." [Doc.

24, p. 16].

First things first: Plaintiff's Complaint is completely devoid of any allegation that the investigation had shortcomings or that Defendant did not follow its disciplinary procedures. *See generally* [Doc. 1]. And Plaintiff cannot use his Response brief as a means of amending his Complaint. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (explaining that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment" but instead but follow Federal Rule of Civil Procedure 15(a)'s proper procedure for amending complaints).

But even looking past this pleading deficiency, there is no evidence to show that Defendant applied its disciplinary procedures disparately. Plaintiff points to Defendant's No-Harassment Policy, which states that Defendant "do[es] not tolerate the harassment of . . . employees . . . relating to an individual's race" and that violations of the policy "will result in disciplinary action, up to and including immediate termination." [Doc. 24-4, p. 2]. Plaintiff appears to argue that because Defendant didn't find that the black employees racially harassed Plaintiff, it didn't apply its policy so that Plaintiff was harmed. However, in this case, Defendant wasn't required to side with Plaintiff in its investigation. As explained above, Defendant conducted an informal investigation that met its legal obligations. *Baldwin*, 480 F.3d at 1304 ("All that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include conducting the

inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a reasonably fair estimate of truth."); *cf. Miller*, 277 F.3d at 1278–79 (holding that the mere existence of an anti-harassment policy was insufficient to preclude a jury from finding employer responsibility where there was "absolutely no evidence in the record to indicate that [the employer] took any action whatsoever against [the perpetrator], let alone that which would rise to the level of appropriate and immediate").

Here, Defendant's employees, Faircloth and Harrison, informally investigated the situation, getting both sides of the story. [Doc. 21, Faircloth Depo., p. 31:17-20]; [Doc. 18, Harrison Depo., pp. 24:20-25:3]. Harrison also investigated the matter and found no evidence that any of the alleged conduct was based on race, and Faircloth found the evidence conflicting and inconclusive. *See* [Doc. 18, Harrison Depo., p. 68:2-6]; [Doc. 21, Faircloth Depo., pp. 31:21-32:1]. Plaintiff alleges that Harrison believed the co-workers over him, *see* [Doc. 24-1, p. 7 ¶ 31], but there is no hint of evidence that Faircloth, Harrison, or any other supervisor conducted a half-hearted investigation out of racial animosity for Plaintiff—let alone one sufficient to paint a "convincing mosaic" of racial discrimination based on any disparate treatment of Plaintiff just because he is white. *See Smith*, 644 F.3d at 1327–28.

Without such evidence, it doesn't matter that Defendant chose not to use its disciplinary procedures against Plaintiff's co-workers. It seems to the Court that

without such evidence, this claim is just a back-door attempt to take another stab at a hostile work environment claim, which the Court already rejected. Accordingly, the Court finds that the evidence is insufficient to support a jury verdict for disparate treatment, and Defendant is entitled to judgment as a matter of law.

## <u>CONCLUSION</u>

Because Defendant has shown that there is no genuine dispute of material facts as to the essential elements of Plaintiff's hostile work environment and disparate treatment claims, Defendant is entitled to judgment as a matter of law, and the Court **GRANTS** its Motion for Summary Judgment [Doc. 16]. The Clerk shall enter JUDGMENT accordingly and close the case.

**SO ORDERED**, this 16th day of March, 2024.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**